COMMONWEALTH vs. JEFFREY COY.

Suffolk. June 13, 1980. — August 6, 1980.

Present: GREANEY, PERRETTA, & KASS, JJ.

*Identification.*

A confrontation in a hospital between a defendant and a victim shortly
    after the occurrence of two violent crimes was not so unnecessarily
    suggestive of the defendant as to warrant suppression of the victim's
    identification. [368-376]

INDICTMENT found and returned in the Superior Court on
February 5, 1975.

A motion to suppress evidence was allowed by *Zobel,* J.
An application for an interlocutory appeal filed in the Su-
preme Judicial Court was allowed by *Liacos,* J., and the
case was transferred by him to the Appeals Court.

*Robert L. Cooperstein,* Assistant District Attorney (*Jan
Roller,* Special Assistant District Attorney, with him) for the
Commonwealth.

*Stephen Hrones* for the defendant.

GREANEY, J. In this case, on the Commonwealth's appeal
(G. L. c. 278, § 28E; G. L. c. 211, § 4A), we are asked to
pass upon the constitutional acceptability of an identifica-
tion of the defendant made by the victim at a hospital con-
frontation shortly after the occurrence of two violent
crimes. After an evidentiary hearing, at which the victim
and two Boston police officers testified, a judge of the
Superior Court ordered the identification made at the
hospital suppressed. Based on his assessment of the out-of-
court identification, he also ruled that the victim's proposed
in-court identification lacked an "independent source"
(*Commonwealth* v. *Botelho,* 369 Mass. 860, 865-869
[1976]), and, alternatively, that it was "unreliable" (*Neil* v.

*Biggers,* 409 U.S. 188 [1972]; *Manson* v. *Brathwaite,* 432
U.S. 98 [1977]), and ordered that identification suppressed
as well. We reverse the orders, holding that the hospital
identification met constitutional standards. Our holding
will render it unnecessary to consider other issues pertaining
to the proposed in-court identification.

The historical facts taken from the judge's findings, sup-
plemented in minor respects by the uncontradicted evi-
dence, are these. On November 8, 1974,[1] at approximately
8:30 P.M., the victim, a Roman Catholic nun, was alone in
the Symphony Hall subway station in Boston when she was
approached by a young man whom she identifies as the de-
fendant. After a brief conversation, this man assaulted her
by striking her head against the subway wall and throwing
her to the ground. The first assailant was then joined by a
second young man who knelt by the victim. Both men de-
manded her money. She gave her first assailant twelve
dollars (consisting of a ten dollar bill and two one dollar

---

[1] The defendant was fourteen years old at the time of the incident. The
delay in bringing the case to trial stems from the following sequence of
events. In May, 1975, the Supreme Court of the United States held that
the prosecution of a juvenile in an adult proceeding after an adjudicatory
proceeding in Juvenile Court violated the double jeopardy clause of the
Fifth Amendment. *Breed* v. *Jones,* 421 U.S. 519, 541 (1975). The de-
fendant, a juvenile at the time of the incident, was initially tried in
Juvenile Court in January, 1975; after a full trial, the Juvenile Court
judge declined to find him delinquent but elected to bind him over to the
Superior Court for trial as an adult. In 1976, the Federal District Court
for the District of Massachusetts granted a stay of all State court pro-
ceedings then pending in which juveniles had been bound over for trial as
adults prior to the decision in *Breed* v. *Jones. Jackson* v. *Superior Court,*
423 F. Supp. 50, 51-52 (1976). In 1977, the Court of Appeals for the First
Circuit determined that the holding in *Breed* v. *Jones* should not be ap-
plied retroactively to all cases then pending, but that a person in the
defendant's position should be permitted to make a particularized show-
ing that the juvenile proceedings tipped his hand in a manner to require
individual relief from pre-*Breed* proceedings. *Jackson* v. *Superior Court,*
549 F.2d 215, 219 (1st Cir.), cert. denied, 430 U.S. 975 (1977). The de-
fendant's *Jackson* motion to dismiss the adult proceedings was denied
without prejudice on February 19, 1980, and that action is not before us.
As a result, the defendant's motion to suppress the identification was
heard in April, 1980, some six years after the incident took place.

bills) and the second man some forty cents in change. After yielding the money, the victim was again assaulted and kicked before the youths fled. The entire episode lasted approximately five minutes and took place in lighting conditions found by the judge to be "fair."

After the assault and robbery, the victim was transported to St. Elizabeth's hospital by police van. She informed one of the officers in the van that her assailants were two "black youths under twenty," and she described the person she believes to be the defendant as approximately her height (five feet, six inches), "under twenty-one" with "dark eyes" and wearing a navy type watch cap, a blue coat and maroon pants. She described the second youth as wearing a maroon jacket and brown pants.

At approximately "8:34 P.M.," two other police officers who had received the radio dispatch which broadcast the descriptions observed two black youths in a fast-food restaurant located within two blocks of the subway station. The officers arrested the young men because they fit the description relayed by the dispatch and searched them. In the search a ten dollar bill and two one dollar bills were taken from the defendant and some loose change was taken from his companion. The officers then ascertained that the victim was at the hospital and arranged to transport the two men to St. Elizabeth's. Upon reaching the hospital the following events, as described by the judge's findings, occurred: "The victim was in a small room near the emergency room. She had not yet been treated, although she was in a bed in hospital garb. The room in which she was then lying was small. When the defendant and his companion were brought into her presence, they were stood at the foot of the bed by the police officers. One police officer stood on each side of the bed, and a third police officer stood behind the defendants. I find that one of the police officers said to the victim, 'Sister, take a good look at their faces and tell me if these were the young men at the subway station.' I find that the victim then said, 'It's them.' I find that the police officer then said, 'Take a good look. I want you to be sure.'

I find that the victim said, 'It's them.' I find that at the time of his arrest and at the time of the confrontation, the defendant was wearing a blue watch cap — that is to say, a knit cap of dark Navy-blue woolen-type material . . . a blue jacket, maroon pants and a pink shirt."

At the time of the confrontation, the victim was awaiting medical treatment for facial wounds but had not been medicated. The judge found that the identifications were made "certainly within an hour, or at the most an hour and a half" after the incident. The defendant was subsequently indicted for unarmed robbery and assault and battery by means of a dangerous weapon (kicking with a shoe).

The judge concluded that the events at the hospital "conveyed to the victim, given her state of mind, her status in life and the circumstances of the confrontation, a clear . . . indication that the police desired her to make an affirmative identification." Based essentially on the foregoing findings, the judge ruled that the confrontation was unduly suggestive of the defendant, and he ordered this identification and the proposed in-court identification suppressed.

The Commonwealth argues that the judge's subsidiary findings are clearly erroneous at critical points. We need not explore this proposition because the significant historical facts, outlined above, are supported by the evidence and will be accepted by us. *Commonwealth* v. *Murphy,* 362 Mass. 542, 547 (1972). *Commonwealth* v. *Harmond,* 376 Mass. 557, 560 (1978). *Commonwealth* v. *Moon,* 380 Mass. 751, 755-756 (1980). As we see it, the turning point in the case comes in the conclusions of law reached by the judge. We accord respect to these conclusions but we are not bound by them. *Commonwealth* v. *Cincotta,* 379 Mass. 391, 392 (1979). Rather, the legal conclusions drawn from the facts are subject to our independent examination and judgment and must be reversed if erroneous. See *Commonwealth* v. *Jones,* 9 Mass. App. Ct. 83, 88 n.9 (1980), citing to and quoting from *State* v. *Cefalo,* 396 A. 2d 233, 239-240 (Me. 1979).

As has been frequently stated, one-to-one confrontations, whether photographic or in person, are disfavored, but they are not subject to a rule of per se exclusion. *Commonwealth* v. *Storey,* 378 Mass. 312, 317 (1979), and cases cited. *Nassar* v. *Vinzant,* 519 F.2d 798, 801 (1st Cir. 1975). "Although such confrontations pose particularly serious dangers of suggestiveness, we would consider it ill advised to exclude as constitutionally unacceptable all evidence that has been derived from single person confrontations simply because these identification procedures might have taken place just as easily in the form of lineups." *Commonwealth* v. *Storey, supra* at 317, citing *Commonwealth* v. *Bumpus,* 354 Mass. 494 (1968), and *Commonwealth* v. *Chase,* 372 Mass. 736, 742-743 (1977). The unquestioned authority in this Commonwealth holds that showups arranged by the police between victim and suspect promptly after the crime are constitutionally permissible. *Commonwealth* v. *Bumpus,* 354 Mass. 494, 501 (1968). *Commonwealth* v. *Connolly,* 356 Mass. 617, 624 (1970). *Commonwealth* v. *Denault,* 362 Mass. 564, 566 (1972). *Commonwealth* v. *Barnett,* 371 Mass. 87, 92 (1976). *Commonwealth* v. *Dickerson,* 372 Mass. 783, 789-791 (1977). *Commonwealth* v. *Alicea,* 376 Mass. 506, 514-515 (1978). *Commonwealth* v. *Storey,* 378 Mass. at 317-318. *Commonwealth* v. *Bowden,* 379 Mass. 472, 479 (1980). "[T]he police procedure of arranging . . . showups is recognized as usual and natural and justified by the need for efficient investigation in the immediate aftermath of crime." *Commonwealth* v. *Barnett, supra* at 92. Exigent or special circumstances are not a prerequisite. *Id.* See also *United States* v. *Hines,* 455 F.2d 1317, 1327 (D.C. Cir. 1971), cert. denied, 406 U.S. 975 (1972). Such confrontations permit witnesses to view the suspect while recollection is fresh and before other images crowd in to distort the original picture, and provide the witness with a good opportunity for an accurate identification. "A further consideration is that a prompt confrontation yielding a negative result, besides freeing the innocent, informs the police that a possible predisposition on their part is or may

be in error and releases them quickly to follow another track." *Commonwealth* v. *Barnett, supra* at 92. See also Model Code of Pre-Arraignment Procedure § 160.2(1)(a) and commentary at 436-438 (1975). Such meetings are particularly valuable and permitted where the police are working from a description of the criminal provided by the victim immediately after the crime. *Commonwealth* v. *Bumpus, supra* at 501. *Commonwealth* v. *Dickerson,* 372 Mass. 783, 790 (1977). "[T]he test to be applied in measuring the constitutional sufficiency of single person confrontations under the due process clause is simply whether the confrontation is unnecessarily suggestive of the defendant." *Commonwealth* v. *Storey, supra* at 317, and cases cited. Put another way, if the confrontation is not permeated by "special elements of unfairness" which are designed by the police to suggest to the victim that the defendant is the criminal, it is constitutionally permissible and should be passed to the jury for their evaluation. *Commonwealth* v. *Moon, supra* at 758.

Applying these standards to the facts found by the judge, we believe that the hospital confrontation was not unnecessarily suggestive of the defendant. The decision by the police officers who apprehended the suspects to seek an immediate identification is well-supported by the *Bumpus-Barnett* line of cases. The officers on the street were working from descriptions based on clothing and lacking in other distinguishing physical characteristics. The presence of the suspects near the scene and the discovery of the paper money were important clues, but it was only by arranging a showup that the police could determine whether they might have apprehended the right persons or whether their efforts should be promptly redirected elsewhere. Nor is it necessary that the victim be near death or seriously injured before a single person identification is arranged.[2] "We deem it im-

---

[2] The police on the beat who apprehended the defendant could reasonably have believed at the time they sought the identification that the victim had been seriously injured.

material whether [the victim's] wounds were so critical that haste . . . was essential . . . [because] an identification by a witness to a crime . . . is admissible in evidence if reasonable in the light of all the circumstances." *Commonwealth* v. *Connolly,* 356 Mass. 617, 623-624 (1970).

We do not think that the procedure at the hospital considered in its totality was unfair. The locus of the confrontation in a small room adjacent to the emergency room was not arranged by the police, and we see nothing improper in the display of the two men together. While the presence of three officers added some suggestiveness, it did not amount to a special element of unfairness in light of the fact that two suspects of violent crimes were in custody. The defendant's argument that the suspects should have been introduced to the victim singly is disingenuous; if this procedure were followed it would give rise to the contention that the meeting was unfair because an identification of the first suspect would cause a predisposition on the victim's part to make a positive identification of the second.

We also do not interpret the language used in posing the identification questions as leading or suggestive.[3] Anyone in police custody presented to a hospitalized victim will naturally be perceived as a suspect without a word being said. We view the admonitions by the police to take a "good look" and to be "sure" as designed to avoid the risk of potentially irreparable misidentification, and we consider it important that the police scrupulously avoided mentioning to the victim other incriminating facts known to them, such as the fact that the suspects had been taken into custody near the subway station and the fact that paper money in the exact amount stolen had been discovered in the defendant's pocket.[4] We also consider it especially significant that

---

[3] At argument, defense counsel was asked to frame more neutral questions. The questions offered in response did not differ significantly from those uttered by the police.

[4] It was only after the identifications were made that the police officers informed the victim that they had seized twelve dollars from the defend-

the identifications were twice stated by the victim in positive and unequivocal terms ("It's them").

The judge's observation that the victim's "status in life" may have subtly influenced her selections is not supported by the record; to the contrary, the usual indicia of a constitutionally untrustworthy identification are not present in this case.[5] The defendant's reliance on the decisions in *Commonwealth* v. *Moon*, 380 Mass. 751 (1980), and 8 Mass. App. Ct. 375 (1979), is misplaced because in that case the single-photo identification at the crime scene was permeated with several unfair elements that suggested that the defendant was the culprit.[6] We are satisfied on the facts found by the judge that a prompt display was warranted and that the procedure used was reasonable in the circumstances and within the perimeters of constitutional fair play.

Neither party argued to the judge below or to us the significance, if any, of the police testimony that the defendant and his companion had been placed under arrest prior

---

ant's person. It was also at this juncture that she was shown the paper money for possible identification.

[5] The motion argued by defense counsel in this regard is that the victim as a nun "is a woman whose life vocation has involved the submission of her will to authority," thereby, it is urged, making her more amenable to police suggestiveness. That stereotype does not seem particularly applicable to the present case. The record indicates that the victim had a reasonably good opportunity to see her assailants over a period of several minutes, that she kept careful written notes in the aftermath of the crimes to preserve her observations for future court appearances, that her descriptions did not change in any material way from what were given to the police at the scene, and that her testimony at the suppression hearing was not marked by any major inconsistencies, memory lapses, or signs of vagueness.

[6] Among the factors that persuaded the courts passing on the *Moon* case that the identifications should be suppressed were the facts that the victim's description was very general and tentative, that the police already were reasonably sure of the identity of the culprit, and that the identification process was surrounded by several special circumstances (not present in this case) which suggested that the single photograph shown the victim was that of his assailant. See *Commonwealth* v. *Moon*, 380 Mass. at 757-759, and 8 Mass. App. Ct. at 385-387.

to being transported to the hospital. It is abundantly clear, however, that the police were not attempting to pursue an informal identification procedure for the purpose of avoiding a lineup conducted in accordance with constitutional requirements. See *Commonwealth* v. *Chase*, 372 Mass. 736, 742 (1977). It is not essential to the outcome of the identification questions to determine whether the police had sufficient probable cause to effect an arrest because "it [is still] a reasonable police procedure to confront the two suspects immediately *after arrest* with the witness implicating them in the crime, to insure that the proper parties had been identified." *Commonwealth* v. *Connolly*, 356 Mass. 617, 624 (1970) (emphasis supplied).

In reaching our conclusions, we have been mindful of the judge's assessment of the victim's credibility.[7] We think that this factor, as well as the other arguments made by the defendant as grounds for rejecting the identification completely which have not been specifically discussed, must bow to our observations in *Commonwealth* v. *Jones*, 9 Mass. App. Ct. 83 (1980). There we said: "The goal of the process does not require extirpation of all appearances of doubt. The goal is to ensure that the accused receives a fair trial by not being exposed to an identification which is inherently unreliable or which derives from governmental misconduct at its inception." *Jones* at 92. This line has not been passed and it is "for the jury to decide how much weight to attach to [this] identification[ ], as well as to the [out-of-court identification], when they [are] admitted at trial." *Commonwealth* v. *Cincotta, supra* at 397, and cases cited.

---

[7] For example, the victim testified that the defendant wore a pink shirt and that she mentioned this observation to the police at the scene. The police testified that this fact was inadvertently omitted from the radio dispatch. When taken into custody the defendant was wearing a pink shirt. The judge found that the victim "did not observe [the defendant] to be wearing a pink shirt" at the time of the attack, inferentially finding that she added this to her description after she observed the shirt in the hospital. We also, in reliance on these findings, reject the shirt as an identifying characteristic.

Our conclusion that the hospital identification may be upheld under an analysis which considers its suggestiveness, obviates the need to apply the "reliability" approach established in *Manson* v. *Brathwaite. Commonwealth* v. *Storey, supra* at 319. Finally, because we hold that the victim's pretrial identification of the defendant was not constitutionally infirm, we need not consider if her proposed in-court identification is adequately based on observations of the defendant independent from any improper pretrial identification. See *Commonwealth* v. *Clifford,* 374 Mass. 293, 304 (1978). See generally *Commonwealth* v. *Venios,* 378 Mass. 24, 30 (1979).

The orders suppressing the identifications are reversed.

*So ordered.*